UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHELLEY S.,                          )
                                     )
                Plaintiff,           )
                                     )
        v.                           )        No. 1:21-cv-02917-SEB-MPB
                                     )
KILOLO KIJAKAZI,                     )
                                     )
                Defendant.           )

**REPORT AND RECOMMENDATION ON**
**APPROPRIATE DISPOSITION OF THE ACTION**

Plaintiff Shelley S. seeks judicial review of the Social Security Administration's ("SSA")

decision denying her petition for Disability Insurance Benefits. United States District Judge

Sarah Evans Barker referred this matter to the Magistrate Judge pursuant to 28 U.S.C. §

636(b)(1)(B). (Docket No. 11). Shelly S. argues that the ALJ committed reversible error by

rejecting a treating physician's medical opinion without adequate articulation of supportability

and consistency and by independently substituting his own interpretation of newer medical

imaging. For the reasons set for below, it is recommended that the Commissioner's decision

denying Shelley S. benefits be **REVERSED and REMANDED**.

## I.    BACKGROUND

Shelley S. applied for Disability Insurance Benefits in 2018[1], alleging disability

beginning October 24, 2017. (Docket No. 10-4 at ECF p. 32). She was forty-four years old at the

time of her alleged onset, with at least a high school education, and past relevant work as a

---

[1] The ALJ's original decision (Docket No. 10-4 at ECF p. 32), Shelley S.'s brief (Docket No. 15 at ECF p. 2), and the Commissioner's brief (Docket No. 17 at ECF p. 1) indicate Shelley S.'s application date was July 2018. The record indicates her application date was November 2018 (Docket No. 10-8 at ECF p. 2). This discrepancy is immaterial to this analysis.

bookkeeper and a supervisor. (Docket No. 10-2 at ECF p. 30). Shelley S. alleged that she was disabled by spinal nerve tumors, multiple back surgeries, insomnia, and hypertension. (Docket No. 10-9 at ECF p. 3).

The SSA denied Shelley S.'s application initially and on reconsideration on January 4, 2019 (Docket No. 10-5 at ECF p. 10) and April 9, 2019, (*Id.* at ECF p. 19) respectively. Then, Shelley S., represented by counsel, telephonically appeared before an ALJ on June 10, 2020, for a hearing. (Docket No. 10-3 at ECF p. 4; Docket No. 10-4 at ECF pp. 31-32). The ALJ issued an unfavorable decision on July 9, 2020. (Docket No. 10-4 at ECF p. 29). At Shelley S.'s request, the Appeals Council remanded for a new hearing on November 12, 2020. (Docket No. 10-4 at ECF p. 50).

A second telephonic hearing was held on February 11, 2021, where Shelley S. was again represented by counsel. (Docket No. 10-2 at ECF p. 16). The ALJ issued a second unfavorable decision on March 19, 2021. (Docket No. 10-2 at ECF p. 13). Shelley S. requested review by the Appeals Council once more, although this time they denied the request on September 22, 2021. (Docket No. 10-2 at ECF p. 2). Shelley S. timely filed this action. This Court has jurisdiction under 42 U.S.C. §§ 405(g), 1383(c).

In his second decision, the ALJ followed the five-step sequential evaluation in 20 C.F.R. § 404.1520(a)  and 416.920(a) and concluded that Shelley S. was not disabled. (Docket No. 10-2 at ECF pp. 13-33). Specifically, the ALJ found that:

- At Step One, Shelley S. had not engaged in substantial gainful activity since October 24, 2017, the alleged onset date, and met the insured status requirements of the Social Security Act through June 30, 2021, the date last insured.[2] (*Id.* at ECF p. 19).

---

[2] The ALJ's first decision listed Shelley S.'s date last insured as June 30, 2018, but the Appeals Council corrected this error in its remand order, noting the correct date was June 30, 2021. (Docket No. 10-4 at ECF p. 49).

- At Step Two, Shelley S. had "the following severe impairment: Degenerative Disc Disease, status post Surgeries and Removal of Nerve Root Tumor." (*Id.*)

- At Step Three, Shelley S. did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (*Id.* at ECF p. 6).

- After Step Three but before Step Four, Shelley S. had the residual functional capacity ("RFC") "to perform sedentary work as defined in 20 CFR 404.1567(a)[3] except the claimant must be allowed to use a cane or walker to and from the workstation and allowed to alternate to a sitting or standing position at her option for one-to-two minutes each hour." (*Id.* at ECF p. 22).

- At Step Four, Shelley S. was unable to perform any past relevant work. (*Id.* at ECF p. 30).

- At Step Five, considering Shelley S.'s "age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy," including food and beverage order clerk, addresser, and charge-account clerk." (*Id.* at ECF p. 32).

## II.    APPLICABLE LAW

"The Social Security Act authorizes payment of disability insurance benefits . . . to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The statutory definition of 'disability' has two parts." *Id.* at 217. First, it requires an inability to engage in any substantial gainful activity. *Id.* And second, it requires a physical or mental impairment that explains the inability and "has lasted or can be expected to last . . . not less than 12 months." *Id.*

---

[3] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "'Occasionally' means occurring very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5.

"The standard for disability claims under the Social Security Act is stringent." *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010). "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Id.*

When an applicant seeks judicial review, the Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence supports the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* In evaluating the evidence, the Court gives the ALJ's credibility determinations "considerable deference," overturning them only if they are "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v), evaluating in sequence:

> (1) Whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform h[er] past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2008). "If a claimant satisfies steps one, two, and three, [she] will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then [she] must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's RFC by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and, if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(e), (g). The burden of proof is on the claimant for Steps One through Four, but shifts to the Commissioner at Step Five. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence supports the ALJ's decision, the Court must affirm the benefit denial. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically appropriate. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (citation omitted).

### III. FACTUAL BACKGROUND

Shelley S. arguments are almost entirely related to her back issues, thus, this factual summary chiefly focuses on her back-related evidence.

#### A. Medical Evidence

On May 8, 2017, Shelley S. presented to her family medicine physician, Dr. Anderson, complaining of left-sided back pain that radiated down her leg. (Docket No. 10-15 at ECF p. 61). An x-ray of her lumbosacral spine, taken the next day, showed mild degenerative disc disease from L3-L4 through L5-S1, as well as mild lower lumbar spine degenerative facet joint arthropathy. (Docket No. 10-16 at ECF p. 20). On May 18, 2017, Dr. Anderson indicated Shelley

S. had a positive, left, straight leg raise test and left-sided paralumbar tenderness. (Docket No. 10-15 at ECF p. 59).

A June 2017, MRI of the lumbosacral spine showed two small enhancing lesions along the descending L3 nerve root favored to represent multiple nerve sheath tumors and mild degenerative changes that did not result in significant narrowing of the neural foramina or thecal sac. (Docket No. 10-13 at ECF pp. 48-49). In July she had MRIs of both her cervical and thoracic spine. The MRI of her cervical spine indicated cervical spondylosis, including disc desiccation at C2-C3 and C3-C4, posterior disc/osteophytes at C2 through T1, mild right foraminal stenosis at C4-C5, uncinated degenerative change with mild bilateral foraminal stenosis at C5-C6 and C7-T1, left uncinated degenerative change and foraminal stenosis at C6-C7, and mild effacement of the ventral thecal sac without cord compression. (Docket No. 10-11 at ECF p. 5). The MRI of her thoracic spine showed vertebral hemangiomas at T11 and T12 with mild thoracic spondylosis and a well-circumscribed fluid signal lesion in the right upper pole, consistent with cyst. (Docket No. 10-11 at ECF p. 7).

She was first assessed by neurologist Dr. Dropcho on August 4, 2017, for a possible lumbar nerve root tumor. He started her on prednisone and scheduled a lumbar puncture (i.e., a spinal tap). (Docket No. 10-11 at ECF p. 13). On August 11, 2017, Dr. Dropcho performed the lumbar puncture and discontinued the use of prednisone, from which Shelley S. reported she received no relief. (Id. at ECF p. 10).

On September 5, 2017, Shelley S. was seen by neurosurgeon Dr. Miller, who noted that the lumbar puncture did not evidence any abnormal cytology. (Docket No. 10-11 at ECF p. 14). Shelley S. reported that she still had left leg pain with "some notable weakness particularly when

she is going up or downstairs." (*Id.*). On examination, she had somewhat diminished sensation over the left anterior thigh.

On October 25, 2017, Dr. Miller performed a biopsy and an L2-3 laminoplasty on October 25, 2017. (Docket No. 10-11 at ECF p. 30). The biopsy revealed a grade I schwannoma. (Docket No. 10-11 at ECF p. 19). Thereafter, Shelley S. was hospitalized for three days with physical therapy and occupational therapy evaluations, but was discharged in mild distress, with full dorsiflexion and plantar flexion, guarding on left knee extension and knee hip flexing due to pain. (*Id.* at ECF pp. 30-31).

On November 19, 2017, Shelley S. presented to the emergency department for progressively worsening back pain over the prior week. (Docket No. 10-11 at ECF p. 23). She was admitted for further observation due to concerns of infection. (*Id.* at ECF p. 25). Dr. Miller performed an L2-3 laminectomy and debridement and she was discharged seven days later. (*Id.* at ECF p. 27).

She followed up with family medical practitioner, Dr. Inpanbutr-Martinkus, on December 23, 2017, to whom she reported that her pain was partially controlled but at an acceptable level. (Docket No. 10-15 at ECF p. 47). She next saw Dr. Inpanbutr-Martinkus on February 12, 2018, at which time she reported that her back pain felt worse, with flare ups and several ER trips. (Docket No. 10-15 at ECF p. 45). She exhibited paraspinal and vertebral spine tenderness on palpation, as well as SI joint tenderness on the left. (*Id.*). Findings of paraspinal and/or vertebral spine tenderness on palpation would be quite common on future exams by Dr. Inpanbutr-Martinkus, who typically kept her maintained on a combination of gabapentin, oxycodone, and/or ibuprofen for pain. Other visits in 2018 included April 4 and June 1. (Docket No. 10-15 at ECF pp. 38, 41).

In 2018, Shelley S. went to the emergency room claiming exacerbations of her lower back pain on January 15, February 6, March 6, March 23, June 17, and July 13. (Docket No. 10-12 at ECF pp. 5, 8; Docket No. 10-14 at ECF p. 5; Docket No. 10-18 at ECF pp. 24, 37; Docket No. 10-26 at ECF p. 36). Outside of general pain and tenderness findings on examination, some ER visits had additional findings. Shelly S. had a "somewhat antalgic" gait on examination on January 15 and a positive straight leg raise test on June 17. (Docket No. 10-12 at ECF p. 10; Docket No. 10-18 at ECF p. 39). A lumbar MRI on January 16, 2018, showed the previous laminectomy at L2 and L3, an unchanged nodule in the left thecal sac at L3, and early disc degeneration at L3-4, L4-5, and L5-S1 with disc desiccation and mild disc space narrowing. (Docket No. 10-13 at ECF p. 42). Another MRI, less than one month later, showed at least two nodular intradural enhancing lesions along the distal nerve roots in the lumbar spine, a postoperative appearance of L2 and L3 laminectomies with granulation tissue within the surgical site, and edema in the left L3 transverse process. (Docket No. 10-18 at ECF p. 33).

In 2019, Shelley S. followed up with Dr. Inpanbutr-Martinkus on January 23, February 14, May 6, and October 21. (Docket No. 10-22 at ECF pp. 64, 67; Docket No. 10-27 at ECF pp. 24, 30). Shelley S. noted on February 14, 2019, that she would be open to considering further surgical intervention, but she continued to face challenges getting insurance. (Docket No. 10-22 at ECF p. 64). On examination, in addition to tenderness, Shelley S. had decreased hip flexion and quad strength, and was unable to perform straight leg raising due to pain. *Id.* On May 6, 2019, Shelley S. exhibited decreased hip flexion and quad strength. (Docket No. 10-27 at ECF p. 31).

Also in 2019, Shelley S. went to the emergency department for lower back pain on February 13, March 8, June 22, August 4, August 25, October 15,[4] November 26, and November 28. (Docket No. 10-23 at ECF pp, 3, 32; Docket No. 10-24 at ECF p. 3; Docket No. 10-25 at ECF pp. 24, 39; Docket No. 10-26 at ECF pp. 16, 24, 30). A March 8, 2019, MRI still showed unchanged status post laminectomy condition and unchanged nodules at L2 and L3, as well as degenerative disc desiccation at the L3-4, L4-5, and L5-S1 levels. (Docket No. 10-23 at ECF p. 38). On August 4, straight leg raise testing was positive at 45 degrees on the left side at that time. (Docket No. 10-26 at ECF p. 19).

In 2020, Shelley S. followed up with Dr. Inpanbutr-Martinkus for management of her chronic lower back pain on January 21, March 9, May 5, July 22, and October 29. (Docket No. 10-27 at ECF p. 21; Docket No. 10-48 at ECF p.3; Docket No. 10-47 at ECF pp. 2, 5; Docket No. 10-49 at ECF p. 2). She also went to the emergency department for lower back pain exacerbations on January 8, January 13, March 3, March 21, April 30, May 3, July 2, and October 24 (after a fall). (Docket No. 10-27 at ECF p. 15; Docket No. 10-29 at ECF p. 6; Docket No. 10-36 at ECF p. 3; Docket No. 10-38 at ECF p. 3; Docket No. 10-40 at ECF p. 6; Docket No. 10-42 at ECF p. 4; Docket No. 10-43 at ECF p. 5; Docket No. 10-44 at ECF p. 7). On January 13, in addition to the usual localized tenderness, she had diffused pain to the lower lumbar region and positive straight leg raise testing at 20 degrees on the left leg. (Docket No. 10-45 at ECF p. 4). X-rays on March 3 showed mild progression of degenerative changes in the lumbar spine with a subtle decrease in lordosis at the L4-5 level. (Docket No. 10-33 at ECF p. 6).

---

[4] At this visit, Shelley S. reported she goes to the Emergency Department a few times a year to get a shot of dilaudid to treat her pain and that she no longer followers with her surgeon as she does not have insurance. (Docket No. 10-25 at ECF p. 39).

**B. Hearing Testimony**

In the first hearing, Shelley S. testified that she needed help to get up from sitting and sometimes used a walker to do it herself. (Docket No. 10-3 at ECF p. 15). She said she used counters for support when getting something out of the fridge and relied on considerable assistance from her husband and her daughter. (Docket No. 10-3 at ECF p. 16). She testified that her pain was worse with sitting, as it caused an intense throbbing pain that radiated down her left leg, although she also had pain with lying down. (*Id.* at ECF p. 19). Transition from sitting to standing was difficult for her, but once she did so, she would have some relief from the pain before it returned after a few minutes of standing. She testified, during the attorney's questioning, that she was having a lot of pain even sitting during the hearing and was "trying to get through it," estimating her pain at a nine out of ten. (Docket No. 10-3 at ECF p. 28). She said the effects of her medications made it difficult for her to focus on reading. (Docket No. 10-3 at ECF p. 31).

Turning to the VE testimony, the ALJ asked about jobs available for someone limited to sedentary work with the use of a cane or a walker when going to and from the workstation and the need to alternate between sitting and standing for one or two minutes at the job. (Docket No. 10-3 at ECF pp. 25-26). The VE said that past work could not be performed, but that sedentary, unskilled jobs were available, listing several. (*Id.* at ECF pp. 26-27). When questioned by counsel, the VE testified that the need to walk around every 15 minutes for five minutes at a time would be work preclusive, as would the need for more than one absence per month, on average. (Docket No. 10-3 at ECF p. 33).

The second hearing, after the Appeal Council remanded Shelley S.'s application, was brief. The entire hearing lasted twelve minutes. (Docket No. 10-2 at ECF pp. 41-46).

## IV. ANALYSIS

Shelly S. argues that the ALJ committed reversible error by rejecting a treating physician's medical opinion without adequate articulation of supportability and consistency and by independently substituting his own interpretation of newer medical imaging.

### A. Dr. Inpanbutr-Martinkus, Treating Physician, Opinion

On January 23, 2020, Dr. Inpanbutr-Martinkus completed a physical residual functional capacity questionnaire in which she opined that Shelley S. could sit for fifteen minutes at a time and about two hours in an eight-hour workday, stand for about fifteen minutes at a time, and stand and/or walk for about two hours total in an eight-hour workday. (Docket No. 10-27 at ECF p. 59). Dr. Inpanbutr-Martinkus also noted that the claimant would need periods of walking every fifteen minutes for about five minutes each to adjust her position, and her job would have to permit shifting positions at will. (*Id.*). In addition, she opined that the claimant would need unscheduled breaks during the workday, must use an assistive device when "engaging in occasional standing and/or walking,"[5] and would be absent more than four days per month. (*Id.*). Dr. Inpanbutr-Martinkus also concluded that the claimant could lift and carry less than ten pounds occasionally, rarely twist, and never stoop, crouch, or climb. (*Id.* at ECF p. 60). Moreover, she indicated that Shelley S.'s symptoms would interfere with her attention and concentration frequently (*Id.* at ECF p. 58) and that she would miss more than four days of work per month as a result of her impairments or treatment (*Id.* at ECF p. 60).

In analyzing Dr. Inpanbutr-Martinkus's opinion, the ALJ said:

> This opinion is []not fully consistent with the evidence in the record. As mentioned above, the claimant only occasionally used an assistive device, so she would only need to do so when ambulating

---

[5] This question, like most that the doctor answered, was a yes/no question with the quoted portion the language provided by the form questionnaire itself.

to or from her workstation, rather than for all standing and walking. Further, the claimant did maintain good sitting and fair standing balance (3F/76-77; 14F/3). However, the claimant did have back pain, which worsened with movement including standing (E.g., 2F/8, 16; 7F/53; 11F/2; 17F/42). Therefore, the claimant should only stand and/or walk for two hours in an eight-hour workday. To avoid aggravating her pain, the claimant would also be limited to lifting and carrying ten pounds occasionally. However, she routinely had normal ranges of motion, including in her upper and lower extremities and hands (E.g., 3F/9, 76, 105; 4F/4; 12F/1; 18F/4). Additionally, she was encouraged to stretch and do light activity to prevent stiffness (6F/33; 14F/5). Therefore, the claimant would be able to perform postural movements within the sedentary range of work. Moreover, the claimant had stairs in her home, demonstrating the ability to do some climbing (E.g., 2F/6; 3F/74, 90). Additionally, the claimant demonstrated good sitting activity tolerance, and she was able to sit during the hearing, so she could sit longer than fifteen minutes (3F/77; Hearing Testimony). This opinion is only partially persuasive. Here, Dr. Inpanbutr-Martinkus is one of the claimant's treatment providers (the claimant testified she saw her every two months) and therefore is familiar with the claimant's response to treatment and longitudinal functioning. However, Dr. Inpanbutr-Martinkus's treatment notes do not fully support the severity of her opinion. Of note, she includes drowsiness as a medication side effect in her opinion. However, Dr. Inpanbutr-Martinkus regularly noticed that the claimant's pain was partially controlled to an acceptable level without side effects (E.g., 6F/2, 43, 46; 15F/1, 4, 16; 19F/1, 7). In addition, the claimant only used a single point cane during some appointments (15F/2; *see also* 13F/39; 17F/42; 18F/30; 19F/2). In addition, she had access to the claimant's diagnostic imaging, including having reviewed the claimant's March 2019 lumbar spine MRI showing unchanged nodules without infection (15F/35). Moreover, the claimant often denied fatigue (E.g., 3F/4; 5F/12; 12F/47; 13F/32). In addition, she was routinely alert and oriented (E.g., 2F/2, 11; 3F/14; 4F/4; 15F/7; 18F/4). This is inconsistent with the opinion concerning frequent disruptions in attention. Dr. Inpanbutr-Martinkus also noted muscle weakness as one of the claimant's symptoms, but the claimant maintained grossly normal strength in all muscle groups (E.g., 2F/2, 4, 13; 3F/5; 12F/1, 58; 14F/3). The claimant also testified that this was her family practice provider, rather than an orthopedic specialist.

(Docket No. 10-2 at ECF pp. 28-29).

Shelley S. argues that the ALJ misapplied the agency's rules for weighing medical opinions, including providing a faulty credibility analysis; cherry-picked evidence to support his conclusions; failed to acknowledge the likely absences she would experience as a result of her frequent treatment visits for back pain; and interpreted newer objective medical evidence on his own without submitting it to a medical expert for review.

The Commissioner argues that the ALJ reasonably assessed Dr. Inpanbutr-Martinkus's opinion. She argues that Dr. Inpanbutr-Martinkus's limitations are not supported by her own treatment notes and that Shelley S.'s challenges are insufficient to overcome the deference this Court must grant an ALJ's well-reasoned evaluation of a medical source opinion. Further, the Commissioner argues that Shelley S.'s argument related to her absences relies on a faulty assumption. Finally, the Commissioner argues that the ALJ was not required to adopt a medical expert opinion.

On reply, Shelley S. reiterates that the many positive clinic findings throughout the record cannot be reconciled with the ALJ's statements that she had "consistently normal" exams. She further argues that the Commissioner appears to have waived a response to the argument that the ALJ committed reversible error by independently interpreting newer objective medical evidence.

"The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. For claims like Shelley S.'s that were filed on or after March 27, 2017, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520(c)(A). The SSA

continues to use factors to evaluate the "persuasiveness of medical opinions and prior administrative medical findings" but the "most important factors" to be considered are "supportability" and "consistency." *Id.* How those factors were considered must be explained in the decision. *Id.* at 404.1520c(b)(2). "Supportability" considers the relevance of "the objective medical evidence and supporting explanations presented by a medical source." *Id.* at 404.1520c(c)(1). "Consistency" is compared "with the evidence from other medical sources and nonmedical sources in the claim." *Id.* at 404.1520c(c)(2). Explicit consideration of the remaining factors is permitted, but not always required, and the exceptions are not applicable here. The regulation calls for source-level articulation, meaning the ALJ is required to only "articulate how [he] considered the medical opinions . . . from that medical source together in a single analysis using the factors . . . as appropriate." *Id.* at 404.1520c(b)(1). This Court will affirm an ALJ's consideration of a medical opinion or prior administrative medical finding if it is supported by substantial evidence. *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). The ALJ need only "minimally articulate" his consideration of each opinion. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

First, Shelley S. argues that "the ALJ's characterization of the record as having largely negative clinical findings" did not align with the evidence available. (Docket No. 15 at ECF p. 15). For this, she points to positive clinical exam findings, such as positive straight leg raise testing, decreased strength in the lower extremities, antalgic or broad-based gait, and diminished sensation the left leg (admittedly only predating her 2017 surgeries). (*Id.*) (citing the record). But, the ALJ did not characterize the record as having largely negative clinical findings. (*see* Docket No. 10-2 at ECF pp. 24-26 (noting instances of tenderness, antalgic gait, weakness, and

decreased range of motion)). And, of note, Dr. Inpanbutr-Martinkus's opinion indicated she did

not observe a positive straight leg raising test or abnormal gait. (Docket No. 10-27 at ECF p. 58).

 Next, ALJ reasonably explained why he did not adopt some of the other limitations in Dr.

Inpanbutr-Martinkus's opinion. First, answering a yes/no question, the doctor indicated 'yes,' that

Shelley S. must use a cane or other device to engage in occasional standing/walking. (Docket

No. 10-27 at ECF p. 59). The ALJ recognized that in December 2017 a cane was recommended

for Shelley S. after her second surgery (Docket No. 10-2 at ECF p. 26, citing Docket No. 10-15

at ECF p. 51). Nonetheless, the ALJ noted that the record established that Shelley S. only

occasionally used an assistive device and was often observed walking without assistance.

(Docket No. 10-2 at ECF pp. 26-27). For instance, the ALJ noted that during April 2018, Shelley

S. had an antalgic gait but no assistive device was noted (Docket No. 10-13 at ECF p. 66); during

July 2018, Shelley S. reported she was having some difficulty walking due to pain, "that is not

normal to her" (Docket No. 10-19 at ECF p. 15); in August 2019, Shelley S. was able to

ambulate without difficulty (Docket No. 10-24 at ECF p. 2); in October 2019, Shelley S. was

able to stand without assistance (Docket No. 10-25 at ECF p. 40); in November 2019 Shelley S.

was observed to be ambulatory without mention of an assistive device (Docket No. 10-23 at ECF

p. 4; Docket No. 10-25 at ECF p. 34); in January 2020, Shelley S. had a grossly normal gait,

balance, and coordination without mention of an assistive device (Docket No. 10-27 at ECF p.

17). The ALJ did note during January 2020 Shelley S. ambulated with a single prong cane

(Docket No. 10-27 at ECF p. 22), but again in March and May 2020, she ambulated without

mention of assistive device (Docket No. 10-43 at ECF p. 5; Docket No. 10-44 at ECF p. 3;

Docket No. 10-36 at ECF p. 3). The ALJ reasonably concluded that Shelley S. must be allowed

to use a cane or walker to ambulate to and from the workstation; but, her ability to attend some

appointments without an assistive device demonstrates that she would not always require the use of an assistive device for all ambulation. (Docket No. 10-2 at ECF p. 27). This conclusion was supported by substantial evidence.

Second, Dr. Inpanbutr-Martinkus opined Shelley S.'s pain would frequently interfere with her attention and concentration ("frequently," as defined in the questionnaire she answered meaning 34-66% of the workday). (Docket No. 10-27 at ECF p. 58). The physician did not support that opinion with any findings. As the ALJ pointed out, Shelley S. often denied fatigue and was routinely alert and orientated. (Docket No. 10-2 at ECF p. 29 (citing Docket No. 10-11 at ECF pp. 10, 19; Docket No. 10-12 at ECF pp. 5, 15; Docket No. 10-13 at ECF p. 66; Docket No. 10-14 at ECF p. 13; Docket No. 10-23 at ECF p. 58; Docket No. 10-25 at ECF p. 33)). Moreover, she often demonstrated intact attention and concentration. (Docket No. 10-11 at ECF p. 30, citing Docket No. 10-11 at ECF p. 2; Docket No. 10-12 at ECF p. 77). There is no evidence, nor does Shelley S. point to any evidence, that her attention and concentration were impaired to any degree, let alone one that would prevent her from performing unskilled work. Moreover, while Dr. Inpanbutr-Martinkus noted that Shelley S.'s medications caused drowsiness, this is not reflected in Shelley S.'s contemporaneous treatment notes. Instead, Dr. Inpanbutr-Martinkus consistently noted that medications partially controlled her pain without side effects. (Docket No. 10-2 at ECF p. 29 citing Docket No. 10-15 at ECF pp. 3, 47; Docket No. 10-22 at ECF p. 67; Docket No. 10-27 at ECF pp. 21, 24, 30; Docket No. 10-47 at ECF pp. 2, 5; Docket No. 10-48 at ECF p. 3).

On the other hand, however, the ALJ discredited Dr. Inpanbutr-Martinkus's opinion that she should "never" climb stairs. (Docket No. 10-2 at ECF p. 28, citing Docket No. 10-27 at ECF pp. 57-61). The ALJ noted that Shelley S. had stairs in her home, demonstrating the ability to do

some climbing. (Docket No. 10-2 at ECF p. 29). The ALJ cites three records to support the position that Shelley S. had the ability to do some stairs: (1) a September 11, 2017, report to Dr. Miller that she experienced left leg pain and notable weakness, particularly, when she was going up or downstairs (Docket No. 10-11 at ECF p. 14); (2) a November 23, 2017, occupational therapy evaluation that noted that her house had two levels, which consisted of 14 steps inside and 1 step outside (Docket No. 10-12 at ECF p. 75); and (3) a November 25, 2017, report that she was able to complete 2 flights of stairs with handrail, supervision, and very slow, cautious gait. (Docket No. 10-12 at ECF p. 91). Yet, the ALJ did not mention that on December 25, 2017, just one month after her occupational therapy treatment note, Shelley S. presented to the emergency department for acute exacerbation of her chronic back pain after a slip and fall down one flight of stairs at her home. (Docket No. 10-18 at ECF p. 13). And as Dr. Inpanbutr-Martinkus's own treatment note indicated, Shelley S. had another fall in June or July 2018 when going down narrow steps. (Docket No. 10-27 at ECF p. 41). The ALJ did not address these later records. The ALJ's citation to the medical records showing some, albeit abnormal, ability to manage stairs, without recognizing competing evidence of inability to handle stairs is a prime example of cherry-picking evidence in support of a conclusion and ignoring contrary evidence, both of which are prohibited. See *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Additionally, the ALJ discredited Dr. Inpanbutr-Martinkus's opinion that she could only sit for fifteen minutes at a time for about two hours in an eight-hour workday. (Docket No. 10-2 at ECF p. 28, citing Docket No. 10-27 at ECF pp. 57-61). The ALJ noted that Shelley S.

"demonstrated good sitting activity tolerance, and she was able to sit during the hearing, so she could sit longer than fifteen minutes." (Docket No. 10-2 at ECF p. 29). The ALJ relied on two sources for this statement: (1) a November 23, 2017, occupational therapy report that indicated that she had a sitting activity tolerance of twenty minutes with occasional or minimal signs of fatigue, palpitations, dyspnea, or pain (Docket No. 10-12 at ECF p. 78) and (2) telephonic hearing testimony from Shelley S. that "sitting here right now and talking to you guys [] I'm trying to get through it." (Docket No. 10-3 at ECF p. 28). Her representative further inquired at the hearing "[h]ow long are you sitting before you have to change positions because of the pain?" to which Shelley S. responded "there's nowhere I can go that gives me a lot of relief, so I have to rely on pain medicine, for one, or sit here in pain. I can try to move from side-to-side and that's kind of all I can do [] the pain doesn't go away." (Docket No. 10-3 at ECF p. 30). The hearing, which lasted forty-five minutes, was telephonic, so the ALJ was unable to physically observe Shelley S. as she sat through the hearing. For instance, the ALJ would not have been able to see whether Shelley S. stood for part of the hearing, or shifted in her seat, or grimaced in pain.[6] Shelley S. points to other evidence, not cited by the ALJ, that she was uncomfortable sitting at an exam table (Docket No. 10-15 at ECF p. 59)) or that she sat gingerly in a chair (Docket No. 10-22 at ECF p. 64). Even if this evidence supported the ALJ's decision to reject Dr. Inpanbutr-Martinkus's fifteen-minute, at a time, sitting limit, it is unclear how it supports his ultimate RFC, namely, to be able to alternate from sitting to standing for one to two minutes per hour.

---

[6] The ability of the ALJ "to consider [the plaintiff]'s physical appearance and demeanor at the hearing as one factor in assessing [his] credibility" is lessened in this case, where the hearing was held over the telephone. *Burton v. Barnhart*, 203 F. App'x 737, 743 (7th Cir. 2006) (citing *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000)). *See also*, *Montgomery v. Kijakazi*, 2022 WL 3572830 (N.D. Ind. Aug. 19, 2022).

Finally, with respect to Dr. Inpanbutr-Martinkus, the ALJ did not explicitly address whether the doctor's opinion on absences, namely more than four days a month, was supportable or consistent. (Docket No. 10-27 at ECF p. 60). No principle of review demands that the ALJ go line by line through every statement in a medical opinion and deem it persuasive or not. Shelley S. argues that her extensive record of doctor's visits and emergency room visits supports Dr. Inpanbutr-Martinkus's absence limitation. She summarized her substantial medical history to conclude that she had at least ten days in treatment for her back pain, either in the primary care office, the emergency department, or a hospital stay, for each year between 2017 and 2020. However, Shelley S.'s argument rests on a faulty assumption that each of these occurrences would have required a full day's absence from work, whereas, common sense dictates that some, if not all, of these appointments could be scheduled so they did not conflict with Shelley S.'s work schedule, or at the very least, so that, especially the doctor's appointments, would not result in a full day's absence. In any event, because remand is otherwise warranted, the ALJ can address this evidence as he sees necessary on remand.

## B. "Played Doctor"

As the Seventh Circuit "has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (citing cases). Specifically, an ALJ may not "interpret 'new and potentially decisive medical evidence' without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)). For example, an ALJ may not conclude, without medical input, that a claimant's most recent tests are "consistent" with the ALJ's conclusion about the claimant's impairments. *McHenry*, 911 F.3d at 871 (citation omitted). *See also Back v. Barnhart*, 63 F. App'x 254, 259 (7th Cir. 2003)

(explaining that typical cases of an ALJ impermissibly "playing doctor" involve either "reject[ing] a doctor's medical conclusion without other evidence," or "draw[ing] medical conclusions themselves about a claimant without relying on medical evidence"). The standard is whether the new information "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment," *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016), or whether the updated information was minor enough that the ALJ did not need to seek a second opinion.

Shelley S.'s argument that the ALJ impermissibly "played doctor" has two primary components: (1) she contends that in rejecting portions of the treating physician's opinion, the ALJ had no other medical expert opinion to rely on because the initial level state agency physician found insufficient evidence to form an opinion, in part, because that physician was relying on the outdated, incorrect, date last insured for DIB of June 30, 2018. (Docket No. 10-2 at ECF p. 30; Docket No. 10-4 at ECF p. 10) and while the reconsideration state agency physician limited Shelley S. to light work he also was only operating on the incorrect June 30, 2018 date, (Docket No. 10-4 at ECF pp. 22-25); and (2) the ALJ played doctor by interpreting the x-rays on March 3, 2020, that showed mild progression of degenerative changes in the lumbar spine without the aid of a physician. (Docket No. 10-33 at ECF p. 6).

This Court has previously held that it cannot endorse a rule that an ALJ who rejects all the medical opinions of record as automatically "playing doctor" in later reaching an RFC determination. *Matthew M. v. Kijakazi*, 2021 U.S. Dist. LEXIS 237624 (S.D. Ind. Dec. 13, 2021) (discussing *Simila v. Astrue*, 573 F.3d 503, 514-15 (7th Cir. 2009)). "[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)). Moreover,

here, the ALJ did not reject the treating physician's opinion, in full. He found it partially persuasive and, accordingly, adopted many of the limitations therein.

However, on March 3, 2020, after Dr. Inpanbutr-Martinkus submitted her opinion, Shelley S. presented to the emergency department with a complaint of acute chronic back pain. An x-ray of her lumbar spine compared to her May 2017, lumbar spine series, indicated degenerative changes showed mild progression since the comparison exam in 2017 and a subtle decrease in lordosis at the L4-5 level. (Docket No. 10-33 at ECF p. 6). Moreover, the physician that read the x-ray indicated that if there was no "short-term improvement cross-sectional imaging follow-up may be of value." (*Id.*). On March 9, 2020, Shelley S. followed up with Dr. Inpanbutr-Martinkus. (Docket No. 10-49 at ECF p. 2). Dr. Inpanbutr-Martinkus acknowledged that the March 3, imaging had been conducted, but the progress note did not specifically discuss its findings and the physician's analysis of the same. (*Id.* at ECF pp. 2-3). Dr. Inpanbutr-Martinkus did note that Shelley S. would like to follow with neurosurgery again once she had insurance and that she had increase in pain with radiation down the left leg. The ALJ noted that the March 2020 x-ray showed mild progression since 2017.

These results may corroborate Shelley S.'s complaints, or they may lend support to the ALJ's RFC. This case is a close call as to whether the March 2020 x-ray "changed the picture so much" that the lack of an updated opinion was error, particularly given both the initial and reconsideration state agency physicians were operating on an incorrect date last insured and given the frequent reports in the record that Shelley S. would follow with neurosurgery for further treatment if she could resolve her insurance issues. Given remand is otherwise required, the Court finds the prudent approach be to take a closer look here. The Court does not mean to

imply that this is dispositive of the question of disability, but it does indicate potential significant changes in Shelley S.'s condition that may require an updated assessment by a medical source.

## V. CONCLUSION

For all these reasons, the Magistrate Judge recommends that the court **REVERSE and REMAND** the ALJ's opinion pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration, consistent with this opinion. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1). Failure to file timely objections within fourteen days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure.

**SO RECOMMENDED** the 6th day of February, 2023.

Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana

Served electronically on all ECF-registered counsel of record.